<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 23-582 (SDW) |
| v. | **OPINION** |
| ALI ROGERS, | June 5, 2024 |
| Defendant. | |

      Defendant Ali Rogers ("Rogers" or "Defendant") was charged in a three-count indictment with (1) possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1); (2) possession of cocaine base and heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and (3) possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (D.E. 18.)  Before this Court is Defendant's omnibus motion ("Motion") to request an evidentiary suppression hearing, to suppress evidence seized and statements given during and after a warrantless search and arrest, and to dismiss Counts I and III of the indictment.  For the reasons stated below, the Motion is **DENIED in part**.

I.     <u>BACKGROUND & PROCEDURAL HISTORY</u>

      On October 10, 2021, Detectives Bernard and Johnson and two officers of the Newark Police Department ("NPD") were patrolling the corner of Twelfth Avenue and South Eighth Street in plain clothes and an unmarked police vehicle. (D.E. 31 at 50–52.)  The area is known as a "high crime area" where the NPD has received complaints related to narcotics and guns. (*Id.*)  Detective Johnson observed Rogers standing in front of a liquor store at 196 Twelfth Avenue and an unknown Black female, who was later identified as Taliah Robinson, walking toward Rogers on Twelfth Avenue. (*Id.*)

1

The parties dispute what happened next. The Government alleges that Detective Johnson saw Rogers and Robinson engaging in what looked like a drug transaction: Robinson walked up to Rogers with cash in her hand; Rogers removed a black plastic bag from his waistband and showed it to her. (*Id.*) The detectives then moved closer to Rogers while in their car and saw Rogers put the plastic bag back into his waistband. (*Id.*) Upon seeing the detectives' car moving closer to him, Rogers waved Robinson away and began walking away quickly. (*Id.*)

Rogers presents a different version of the events. According to Robinson's affidavit, she has known Rogers and his family for about twenty years. (D.E. 31 at 54–56.) On October 10, 2021, Robinson was walking to the liquor store on the corner of Twelfth Avenue and South Eighth Street when she saw Rogers walking towards her. (*Id.*) She stopped to chat and gave Rogers a hug because his brother was shot and killed a week before. Robinson represents that she had nothing but her cell phone in her hands and that Rogers did not pull anything out of his waistband. (*Id.*) When Rogers saw the unmarked police vehicle, he said to her something like "I don't like the way these cars are looking" and started walking away from Robinson quickly. (*Id.*) Robinson says she saw the unmarked police cars and went inside the liquor store, fearing something bad was going to happen. (*Id.*) She did not see Rogers afterward. (*Id.*)

Robinson's affidavit, however, does not contradict what happened after Rogers walked away from the liquor store. As Rogers walked away, he looked over his shoulder, pushed an object into his pants, and pulled his sweater over his waistband. (D.E. 31 at 50–52.) The detectives exited their car and ran after Rogers, who then began sprinting into an alley between two buildings on Twelfth Avenue. (*Id.*) The detectives identified themselves as police and told Rogers to stop. (*Id.*) Rogers ignored the detectives' command and tried to climb over a fence at the end of the alley. (*Id.*) At this point, Detective Johnson caught up with Rogers and grabbed him by his sweater

2

and waistband area from behind, felt the handle of a gun, and pulled him to the ground.  (*Id.*)  While Rogers was on the ground, his sweater was lifted, allowing the detectives to see the handle of a handgun protruding from his front waistband.  (*Id.*)  After discovering the gun, the detectives handcuffed Rogers and retrieved the gun.  (*Id.*)  The detectives then searched Rogers and found a black plastic bag containing heroin and crack cocaine in his front waistband.[1]  (*Id.*)

Prior to Rogers's arrest, he had three prior felony convictions involving drug possession and distribution and burglary.  (D.E. 33 at 10.)  On March 7, 2008, he was sentenced to three years of probation for drug possession with intent to distribute within one thousand feet of a school.  (*Id.*)  On April 8, 2013, he was sentenced to time served for burglary.  (*Id.*)  Most recently, on April 15, 2013, Rogers was sentenced to three years in prison for distribution of controlled substances within a school zone in violation of N.J. Stat. Ann. § 2C:35-7.  (*Id.*)  He completed all custodial portions of these offenses before he was arrested for the instant offense.  (*Id.*)

On January 7, 2022, a Federal Complaint was filed against Rogers regarding the instant arrest, charging him with:  Count I:  possession of a firearm and ammunition by a convicted felon, 18 U.S.C. § 922(g)(1); and Count II:  possession of a controlled substance with intent to distribute, 21 U.S.C. § 841(a)(1).  (D.E. 1.)  On July 20, 2023, a federal grand jury returned an indictment, charging Rogers with the same two offenses above and a third offense (Count III):  possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A)(i).  (D.E. 18.)

## II. DISCUSSION

### A. Motion for a Suppression Hearing and to Suppress Evidence

---

[1] Rogers's motion brief notes that videos from the officers' body cameras were provided in discovery and that although the videos did not have any audio, one of the videos contains footage of the chase before the actual arrest. (D.E. 31 at 6.)

3

Rogers moves for a suppression hearing and to suppress evidence obtained by law enforcement during and after his arrest on the grounds that his Fourth Amendment rights were violated when he was seized and searched without a warrant. Rogers's motion is denied because the officers lawfully seized and searched him, and Rogers has not raised any issues of fact material to the resolution of his constitutional claim.

A party is not entitled to a pretrial evidentiary hearing as a matter of course. *See* Fed. R. Crim. P. 12(c). "A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to show that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *United States v. Rashid*, 593 F. App'x 132, 133 n.2 (3d Cir. 2014) (citing *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)). "A trial court may refuse a defendant's request for a suppression hearing and motion to suppress if the defendant fails to allege facts that, if proved, would require the grant of relief." *United States v. Cummings*, 156 F. App'x. 438, 444 (quoting *United States v. Richardson*, 764 F.2d 1514, 1526–27 (11th Cir. 1985)).

While Rogers generally challenges the narrative of the police report, he has not presented any controverted facts that would establish a colorable claim that the government obtained evidence by violating his constitutional rights. *See United States v. Jackson*, 363 F. App'x. 208, 210 (3d Cir. 2010) (holding that the district court did not abuse its discretion in denying a suppression hearing where the defendant did not offer any version of events contrary to the version contained in police reports attached to his motion).

Rogers argues that an evidentiary suppression hearing is warranted because Robinson's affidavit presents material facts in dispute. Even assuming Robinson's version of events is true, these facts are not material to the resolution of Rogers' Fourth Amendment claim. NPD officers

had reasonable suspicion to stop and frisk Rogers, which gave the officers probable cause to arrest and search Rogers, based on the following uncontroverted facts: the officers encountered Rogers in a high crime area; as the officers moved closer to Rogers, he began walking away furtively, overlooking his shoulders, and pushing something into his pants; when the officers announced themselves and asked Rogers to stop, Rogers ran and tried to climb over a fence in an alley; the officers grabbed and pulled Rogers from the fence before they frisked him, found a gun, and handcuffed him. After Rogers was arrested, the officers searched him and found narcotics.

Neither a suppression hearing nor suppression of evidence is warranted because police officers lawfully conducted a stop, a frisk, an arrest, and a search.

1. *The Fourth Amendment*

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court set forth an exception to the warrant requirement that allows a police officer to conduct a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). A reasonable suspicion is more than a "hunch" but "considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted).

Any evidence obtained incident to an unconstitutional seizure unsupported by reasonable suspicion must be excluded. *See United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing

5

*Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)). Courts determine whether reasonable suspicion existed to support a stop under an objective standard and a totality of the circumstances approach. *See United States v. Hester*, 910 F.3d 78, 87 (3d Cir. 2018).

To prevail on a motion to suppress, a defendant generally bears the burden of proving, by a preponderance of the evidence, that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992). When a defendant has established that a search or seizure was conducted without a warrant, however, the burden shifts to the government to demonstrate by a preponderance of the evidence that the warrantless search did not run afoul of the Fourth Amendment. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

2. *Terry stop*

Rogers was lawfully stopped for investigatory purposes when Detective Johnson grabbed him as he tried to jump over a fence to evade the police. Case law has recognized the following factors, which are present in this case, as support for finding reasonable suspicion to stop a suspect: unprovoked flight from a high crime area, *Wardlow*, 528 U.S. at 124, furtive movements, and "refusal to obey the officers' orders." *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997).

*Wardlow* is instructive to this Court's analysis. The Supreme Court held that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion. *Wardlow*, 528 U.S. at 125–26. In *Wardlow*, the defendant fled from two uniformed officers patrolling in an area known for heavy drug trafficking upon seeing the officers and ran through an alley before the officers stopped him and conducted a patdown. *Id.* at 121–22. The officers found a handgun with live ammunition on the defendant and arrested him. *Id.* The *Wardlow* court found

that the defendant's "unprovoked flight upon noticing the police" in a high crime area gave the officers a reasonable suspicion that the defendant was involved in criminal activity. *See id.* at 124.

Similarly, the Third Circuit held in *United States v. Bonner* that the defendant's flight from a lawful traffic stop and his continued fleeing despite repeated orders to stop provided the police with reasonable suspicion to stop him for further investigation. *See* 363 F.3d 213, 218 (3d Cir. 2004). Based on the facts in the record and the analogous facts in *Wardlow* and *Bonner*, the detectives had reasonable suspicion to stop Rogers under the totality of the circumstances.

Rogers argues that he was subjected to a full arrest, which would have required the officers to have probable cause, rather than a *Terry* stop when Detectives Johnson and Bernard chased and grabbed him. Rogers specifically points to the fact that the detectives used force to bring him into custody by pulling him from the fence to the ground and handcuffing him. Whether a seizure is a stop or an arrest does not turn on only the amount of force used by law enforcement. There is no "bright-line rule to distinguish a warrantless arrest from an investigatory stop." *United States v. Torres*, 961 F.3d 618, 622 (3d Cir. 2020). Instead, the "reasonableness of the intrusion is the touchstone" of a court's analysis. *Id*. The Supreme Court has "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Depending on the circumstances, police officers making a *Terry* stop may tackle,[2] handcuff,[3] or even point their guns at a suspect[4] without effectuating a full arrest. Thus, Rogers' argument that he was arrested without probable cause when Detective Johnson grabbed him is unpersuasive.

---

[2] *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (holding that the police's tackling of the defendant, who fled from a traffic stop and continued to flee despite repeated orders to stop, was a *Terry* stop).

[3] *United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020) (holding the defendant's seizure was an investigatory stop even though the officers pointed their guns at and handcuffed the defendant).

[4] *Id*.

7

*3. Frisk*

Under *Terry*, when an officer conducts an investigatory stop, the officer may also perform "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed" so long as the officer's belief that his safety or that of others may be in danger is objectively reasonable. *Id*.

Here, considering the totality of the circumstances, the detectives had "specific and articulable facts which, taken together with rational inferences from those facts," reasonably warranted Detective Johnson's frisking of Roger's front waistband area when he grabbed Rogers from behind him. *See id*. at 21. Therefore, the detective's frisk of Rogers's waistband area was lawful.

*4. Arrest*

The detectives had probable cause to arrest Rogers by handcuffing him after they observed that Rogers was carrying a gun under his front waistband.

A warrantless public arrest does not violate the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). To determine whether an officer had probable cause to arrest an individual, a court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). This determination is made based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230–32 (1983).

Here, the officers had probable cause based on the information they obtained from their brief stop and frisk of Rogers. When Detective Johnson grabbed Rogers's front waistband area, he felt an object which he recognized to be the handle of a gun. Once Detective Johnson pulled Rogers off the fence and Rogers fell to the ground, the detectives observed in plain view the handle of a silver handgun protruding from Rogers's waistband. The observation of a gun in plain view gave the officers probable cause to arrest Rogers. *United States v. Steed*, 395 F. App'x 850, 853 (3d Cir. 2010) (holding that once the officers stopped the defendant for investigatory purposes and observed a gun in the defendant's waistband, "what had only been a reasonable suspicion to investigate rose to probable cause to arrest").

5. *Search incident to arrest*

The detectives lawfully conducted a search incident to arrest and discovered a black plastic bag containing heroin and crack cocaine in Rogers's waistband.

It is well established that an officer may conduct a search incident to a lawful arrest of the space within an arrestee's immediate control. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest."); *Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, . . . it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

The search incident to arrest exception to the warrant requirement derives from interests "in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338. Here, the detectives lawfully arrested Rogers immediately after they discovered a gun on him. After the arrest, the officers searched Rogers and found illegal narcotics

9

in his waistband—an area within Rogers' immediate control. Therefore, the search incident to arrest was lawful.

In sum, under the totality of the circumstances, Rogers's Fourth Amendment rights were not violated when: (1) the detectives grabbed Rogers while he attempted to flee by jumping on a fence (a *Terry* stop); (2) Detective Johnson felt an object that was akin to the handle of a gun in Rogers's front waistband area (a frisk); (3) the detectives handcuffed Rogers after observing in plain view the handle of a gun protruding from his front waistband while Rogers was on the ground (an arrest); and (4) when the detectives conducted a search incident to arrest to protect their own safety and to preserve potential evidence. Therefore, Rogers' motion to suppress is denied.

**B. Motion to Dismiss Counts I and III of the Indictment**

Section 922(g)(1), also known as the federal "felon-in-possession" law, makes it "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess . . . any firearm or ammunition." Rogers moves to dismiss Counts I and III of the indictment, under Federal Rule of Criminal Procedure 12(b), challenging § 922(g)(1)'s facial and as-applied constitutionality under the Second Amendment.[5] For the reasons set forth below, Rogers's motion to dismiss the firearm-related counts is denied.

   *1. Legal standard for Second Amendment challenges*

The Second Amendment of the United States Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held the Second Amendment applies outside the home and protects

---

[5] While Rogers moves to dismiss Counts I and III of the indictment, he makes no argument for why Count III, which alleges a violation of 18 U.S.C. § 924(c)(1)(A)(i), should be dismissed in his briefing. This Court presumes that Defendant moves for the dismissal of Count III by extension if it is determined that Count I is unconstitutional. For the reasons set forth herein, this Court need not write a separate analysis for § 924(c)(1)(A)(i) and summarily denies the motion to dismiss Count III.

10

"ordinary, law-abiding" citizens' right "to carry a handgun for self-defense outside the home." 597 U.S. at 9–10. The *Bruen* Court sets forth a history-based framework for evaluating the constitutionality of firearm regulations—that is, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

Accordingly, courts must apply a two-step test. First, whether the Second Amendment's plain text covers a defendant's conduct. If so, then a court must assess whether the government has demonstrated that "the regulation is consistent with this Nation's historical tradition of firearm regulation" to overcome the presumption that the conduct at issue is constitutionally protected. *Id.*

*Bruen*'s second step requires a "more nuanced approach" in cases "implicating unprecedented societal concerns or dramatic technological changes" that "were unimaginable at the founding." *Id*. at 27–28. In such cases, the government need not identify a "historical twin"; rather, a "well-established and representative historical analogue" suffices. *Id*. at 30. Courts must reason "by analogy," which "requires a determination of whether the two regulations are relevantly similar" using "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 28–29 (citations omitted).

Section 922(g)(1) is effectively a lifetime ban on firearm and ammunition possession for people who have prior felony convictions. Thus, this Court will apply *Bruen*'s framework here.

2. *Rogers's as-applied challenge to § 922(g)(1)*

"An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). Applying

11

*Bruen*'s two-step test, this Court evaluates whether § 922(g)(1) violates Rogers's Second Amendment rights as applied to him. This Court finds that it does not.

### a. Whether the Second Amendment covers Rogers's conduct

Under *Bruen*'s first step, this Court must determine whether the Second Amendment applies to (1) Rogers and (2) his conduct. *See Range v. Att'y Gen. U.S. of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc).

The Second Amendment applies to Rogers. *Range* has made clear that the Second Amendment applies to all Americans, not only to law-abiding citizens.[6] *Id.* at 102–03 (rejecting the government's argument that only "law-abiding, responsible citizens" are among "the people" protected by the Second Amendment).

The next inquiry is whether the Second Amendment applies to Rogers's *conduct*. Some district courts in the Third Circuit consider a defendant's purpose for firearm possession while others have found that there is no reason to require a defendant to show a lawful purpose for his possession of firearm. *See United States v. Claiborne*, No. 22-672, 2024 WL 112603, at *3 (D.N.J. Jan. 10, 2024) (discussing cases that do and do not require consideration of a defendant's purpose for firearm possession).

A conduct analysis that considers the purpose for a defendant's firearm possession is more consistent with the Supreme Court's precedent and the analytical framework applied by *Range*. *Bruen* made clear that "the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever *purpose*." 597 U.S. at 21 (emphasis added). In the same vein, the Supreme Court has stated that "the Second Amendment protects a personal right to keep and bear arms for *lawful purposes*." *McDonald v. City of Chicago*,

---

[6] The Government contests *Range*'s sweeping proposition that "this language covers all Americans and not only law-abiding persons" and "preserves this argument for appeal." (D.E. 33 at 27 n.6.)

12

561 U.S. 742, 780 (2010) (emphasis added).  Furthermore, the Third Circuit considered the purpose behind the petitioner's proposed conduct in *Range*, stating that "Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by [*District of Columbia v. Heller*, 554 U.S. 570 (2008)]." *Range*, 69 F.4th at 103.  Accordingly, this Court finds that the mere possession of a firearm by a criminal defendant is insufficient to satisfy the conduct analysis without any showing of a lawful purpose.

Other courts have adopted the "lawful purpose" approach and found that the Second Amendment does not protect a criminal defendant's right to possess a firearm while engaging in criminal acts.  *See, e.g., United States v. Velazquez*, No. 23-657, 2024 WL 49690, at *12 (D.N.J. Jan. 4, 2024) ("[T]his Court gravely doubts the Second Amendment's text protects [defendant's] conduct—possessing a firearm while allegedly engaging in drug trafficking."); *Claiborne*, 2024 WL 112603, at *4  ("[K]nowing, unlicensed possession of a weapon by a felon outside the home, regardless of the purpose—is not protected by the Second Amendment."); *United States v. Porter*, 630 F.3d 1260, 1261 (9th Cir. 2011) ("[I]t cannot seriously be contended that the Second Amendment guarantees a right to use a firearm in furtherance of drug trafficking.").

Rogers has not shown, by a preponderance of evidence, that he was carrying a handgun for a lawful purpose at the time of his arrest.  *See United States v. Jenkins*, No. 23-088, 2023 WL 6534200, at *16 (finding that defendant failed to show, by a preponderance of the evidence, that his possession of a firearm was "for a Second Amendment purpose").  Because possessing a firearm while engaging in drug distribution is not protected by the Second Amendment, Rogers's as-applied challenge fails.  *See Velazquez*, 2024 WL 49690, at *12 (rejecting an as-applied challenge to § 922(g)(1) because possession of a firearm "in connection with an alleged drug deal" is not protected Second Amendment conduct).

13

> b. <u>Whether § 922(g)(1) comports with our nation's historical tradition of firearm regulation</u>

Even if the Second Amendment covers Rogers's conduct, his as-applied challenge falters under the second step of *Bruen*'s test. The Government has affirmatively proven that enforcing § 922(g)(1) against Rogers is consistent with "our Nation's history and tradition" because disarming people posing a danger to society is deeply rooted in our country's legal traditions.

*Bruen* requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's . . . historical understanding." *Bruen*, 597 U.S. at 26. Under the "analogical reasoning" approach, the Government must "identify a well-established and representative historical analogue, not a historical twin." *Id.* at 30 (emphasis in original). In other words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

The Government points to historical laws "from before, during, and even after the founding," as examples of analogous firearm restrictions from seventeenth-century England to Reconstruction, that disarmed individuals like Rogers. (D.E. 33 at 34–40). For example, founding-era state legislatures disarmed entire groups they deemed dangerous or untrustworthy, such as British loyalists and those carrying arms in a way that caused fear among the people. (*Id.* at 34–35); *see Range*, 69 F.4th 96 at 111 (Ambro, J., concurring) (observing that "§ 922(g)(1) is presumptively lawful" by analogizing it with founding-era laws disarming people who "would threaten the orderly functioning of society if they were armed"). At the Pennsylvania ratifying convention, a proposal stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." (D.E. 33 at 35.)

14

Post-ratification, many States enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55. The Government argues that those laws show that people who were "reasonably accused of intending to injure another or breach the peace" could be subject to firearm restrictions that did not apply to others. (D.E. 33 at 35 (citing *Bruen*, 597 U.S. at 57).) Laws aimed at disarming dangerous individuals continued even after the Civil War. The Government points to laws during Reconstruction that disarmed "disorderly person, vagrant, or disturber of the peace" and individuals "convicted of making an improper or dangerous use of weapons." (*Id.* at 36 (citing *Bruen*, 597 U.S. at 63).)

Other circuits have reached the same conclusions. For example, the Eighth Circuit, having conducted a detailed historical review, likewise concluded that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *United States v. Jackson*, 69 F.4th 495, 505–06 (8th Cir. 2023). The Tenth Circuit similarly found that *Bruen* leaves intact "the constitutionality of longstanding prohibitions on possession of firearms by convicted felons" and "contains . . . potential signs of support for these prohibitions." *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023).

The Government has carried its burden of showing that there are historical analogues aimed at restricting the possession of firearms by those who were considered potentially dangerous. Rogers's conduct—carrying a handgun while he was allegedly engaging in drug trafficking—is undoubtedly dangerous. *See Smith v. United States*, 508 U.S. 223, 240 (1993) (stating that "drugs and guns are a dangerous combination" in the context of interpreting another federal firearm statute, 18 U.S.C. § 924(c)(1)).

In sum, § 922(g)(1)'s ban on firearm possession by felons is consistent with our country's historic tradition of regulating firearms and is therefore constitutional as applied to Rogers.

      c.  Rogers's reliance on *Range*

Rogers argues that, like the petitioner in *Range*, he has no prior violent convictions and that there is no historical support for disarming someone who is not a violent criminal. Rogers's argument is unpersuasive because *Range* is a highly distinguishable case.

The Third Circuit emphasized that its decision in *Range* was a "narrow one." *Range*, 69 F.4th at 106. Range, unlike Rogers, was convicted of a state misdemeanor (considered to be a felony for § 922(g)(1) purposes due to the maximum sentence being five years imprisonment) for making a false statement to obtain food stamps. *Id.* at 98. Further, unlike Rogers, Range served a probationary sentence and otherwise lived without contact with the criminal justice system for over twenty years. *Id.* In addition to his misdemeanor, Range's criminal history is "limited to minor traffic and parking infractions and a summary offense for fishing without a license." *Id.* He then came to court seeking a declaration that § 922(g)(1) violates the Second Amendment as applied to him so that he could purchase a hunting rifle or a shotgun for self-defense at home. *Id.* at 99.

Rogers, on the other hand, has a far more extensive and serious criminal history. He has had three prior felony convictions since 2008. His most recent conviction from 2013, a drug distribution offense, resulted in a sentence of three years in prison. Courts have found that a person like Rogers, who has committed drug possession or distribution offenses, is the kind of dangerous person who has historically been disarmed. *See Jackson*, 69 F.4th at 501 (holding that "[§] 922(g)(1) is not unconstitutional as applied to" a non-violent drug offender "based on his particular felony convictions [for drug trafficking]"); *United States v. Smith*, No. 23-008, 2023 WL 6795807, at *4 (W.D. Pa. Oct. 13, 2023) ("[Section] 922(g)(1)'s ban on firearm possession by persons . . . who have been convicted of drug trafficking is consistent with our country's historic tradition of

16

regulating firearms."); *Porter v. United States*, No. 22-6199, 2023 WL 6366273, at *7 (D.N.J. Sept. 28, 2023) (holding that § 922(g)(1) is constitutional as applied to Petitioner and "Petitioner's prior convictions for drug possession and distribution . . . show that he poses a danger to society").

*Range* is limited to the exceptional circumstances of that petitioner who "stands apart from most other individuals subject to § 922(g)(1)." 69 F.4th at 112 (Ambro, J., concurring); *see United States v. Hall*, No. 23-1430, 2024 WL 510512, at *2 (3d Cir. Feb. 9, 2024) ("Range involved an as-applied challenge to 18 U.S.C. § 924(g)(1) by someone with a single, decades-old conviction of minor welfare fraud. Nothing in that decision suggests that it applies to someone with [a] long, serious criminal history."). Rogers, whose most recent prior felony convictions involved drug distribution and burglary, stands too far in contrast from Range for *Range* to be applicable to him.

Considering the overwhelming body of historical analogues, precedent, and persuasive authority, this Court finds that § 922(g)(1) is constitutional as applied to Rogers under the historical test outlined in *Bruen*.

3. *Roger's facial challenge to 922(g)(1)*

A facial challenge is "the most difficult challenge to mount successfully" because "the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because § 922(g)(1) is constitutional as applied to Rogers, his facial challenge must fail. *United States v. Mitchell*, 652 F.3d 387, 415 (3d Cir. 2011) ("Because the statute is constitutional as applied to [the defendant], he has not shown that there is no set of circumstances under which the statute may be applied constitutionally.") (footnote and citations omitted).

Rogers' facial challenge to § 922(g)(1) is without merit. The Supreme Court has repeatedly found that felon disarmament laws do not violate the Second Amendment. In *Heller*, the Supreme

Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 626, and noted that such regulations are "presumptively lawful." *Id*. at 627 n.26.  The Supreme Court reiterated this point in *McDonald*:  "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626–27).  In *Bruen*, six Justices wrote to emphasize that felon disarmament laws, like § 922(g)(1), are presumed to be constitutional.  *See Bruen*, 597 U.S. at 72 (Alito, J. concurring) ("Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns."); *see also id.* at 80–81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (explaining "the Second Amendment allows a 'variety' of gun regulations" and that *Heller* and *McDonald* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons"); *id.* at 129–30 (Breyer, J., dissenting, joined by Sotomayor, J. and Kagan, J.) (understanding *Bruen* "to cast no doubt on that aspect of *Heller*'s holding" that felon disarmament laws are "presumptively lawful").

Accordingly, this Court rejects Rogers' facial challenge to § 922(g)(1).

### III.  CONCLUSION

For the foregoing reasons, Rogers's Motion is **DENIED**.

                                                                                      /s/ Susan D. Wigenton
                                                                      **SUSAN D. WIGENTON, U.S.D.J.**

Orig:        Clerk
cc:          Cathy L. Waldor, U.S.M.J.
                Parties